**Zachary** C. **Holbrook (13992)**
3293 Harrison Blvd, Suite 240
Ogden, Utah 84403
Telephone: (801) 627-2646
Facsimile: (801) 627-2648
Email: zachary.holbrook@comcast.net

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION WEBER COUNTY

| | |
|---|---|
| MORTEZA EMAMI,<br>*Plaintiff,* | |
| | **COMPLAINT** |
| WEBER STATE UNIVERSITY; BRETT PEROZZI, in his official capacity and individually; CYNTHIA GIBSON, in her official capacity and individually; JANET WINNIFORD, in her official capacity and individually;<br>*Defendants.* | Case No:<br><br>District Court Judge |

Plaintiff, MORTEZA EMAMI ("MORTEZA"), by and through undersigned counsel of record, hereby submits Plaintiffs Complaint.

## **INTRODUCTION**

1.    This Complaint is brought by MORTEZA EMAMI to secure redress for violation of his civil rights to be free from discrimination on the basis of his national origin and religion under the Fourteenth Amendment of the United States Constitution ("Fourteenth Amendment") and under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), for violation of his rights.

2. MORTEZA was subjected to a hostile work environment, discriminated against, retaliated against, and conspired against based on his national origin and religion from April 2010 to February 2014 while working at Weber State University (WSU).

3. MORTEZA seeks to recover, as described herein, compensatory damages, equitable relief (including injunctive relief, back pay and benefits, and/or front pay and benefits), punitive damages, reasonable attorney's fees, and costs incurred by Defendants' violations and this litigation, as well as declaratory relief and any other available and appropriate relief which will vindicate his rights.

## JURISDICTION AND VENUE

4. This court has jurisdiction over this matter pursuant to 42 U.S.C.§12101, et seq.; 42. U.S.C.§ 2000e, et seq.; 42 U.S.C. §§1983 and 1985; the Fourteenth Amendment of the United States Constitution; and 28 U.S.C. §§ 1331 and 1343.

5. Venue is proper pursuant to 28 U.S.C. §1391(a)-(c), 42 U.S.C. §§ 2000e-5(f)(3) and 12117(a), and because the acts alleged were committed by WSU and its employees in this district, and the plaintiff resides in this district.

## PARTIES

6. MORTEZA is an adult citizen of the United States residing in Clearfield City, Utah.

7. WSU is a public university established by the Utah constitution and Utah statutes.

8. WSU's headquarters are located at 3848 Harrison Blvd Ogden UT 84408.

9.    Upon information and belief, Brett Perozzi ("PEROZZI"), is a resident and citizen of the State of Utah.  At all times relevant, PEROZZI was employed by WSU Office of the Vice President of Student Affairs ("STUDENT AFFAIRS") as Associate Vice President of STUDENT AFFAIRS.

10.    Upon information and belief, Cynthia Gibson ("GIBSON") is a resident and citizen of the State of Utah.  At all times relevant, GIBSON was employed by WSU Office of the Associate Vice President of STUDENT AFFAIRS as Executive Director of the International Student and Scholar Center ("ISSC").

11.    Upon information and belief, Janet Winniford ("WINNIFORD"), is a resident and citizen of the State of Utah.  At all times relevant, WINNIFORD was employed by WSU President's Office as Vice President of STUDENT AFFAIRS.

## EXHAUSTION OF ADMINISTRATIVE PROCESS AND TIMELINESS

12.    MORTEZA has exhausted his administrative remedies.  On November 13, 2013, MORTEZA filed with Equal Employment Opportunity Commission ("EEOC") charges of discrimination and retaliation based on national origin and religion under Title VII against WSU.

13.    MORTEZA was issued a right to sue letter from the EEOC on March 27, 2014 which accorded him 90 days to file a civil suit in an appropriate court.

## FACTUAL ALLEGATIONS

**Statutory Prerequisites**

14.     WSU and named Defendants are, and at all relevant times were, "persons" within the meaning of Title VII, 42 U.S.C. §§2000e.

15.     WSU is, and at all relevant times was, an "employer" as that term is defined in Title VI, 42 U.S.C. §§ 2000e.

16.     MORTEZA is, and at all relevant times was, an "individual" within the meaning Title VII, of 42 U.S.C. §§ 2000e.

17.     MORTEZA is, and at all relevant times was, an "employee" within the meaning of Title VII, 42 U.S.C. §§ 2000e.

18.     WSU had more than twenty employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

**MORTEZA's Background and Hiring**

19.     MORTEZA was born in Zanjan, Iran and became a naturalized U.S. citizen on February 15,2005.

20.     MORTEZA received a Master's of Business Administration ("MBA") from the University of Phoenix in 1996.  He has over 26 years work experience in higher education within the Student Affairs profession.

21.     MORTEZA was employed by WSU as the Director of ISSC in the Department of STUDENT AFFAIRS at WSU in April 2004.  MORTEZA was also hired by WSU to assume the

roles of Primary Designated School Official ("PDSO") for the Student and Exchange Visitor

Information System ("SEVIS") and Responsible Officer ("RO") for Department of State.

**MORTEZA's National Origin**

22.    MORTEZA's nation of origin is Iran and is Persian.

23.    MORTEZA's first language is Azeri.

24.    MORTEZA is fluent in Farsi and Turkish.

25.    MORTEZA speaks English with an accent that is immediately apparent to native

English speakers.

**MORTEZA's Religious Background**

26.    MORTEZA is a Shia Muslim.

**MORTEZA Was Subjected to Discrimination, Retaliation, and a Hostile Work Environment From the Outset**

27.    On or about April 22,2010, MORTEZA's supervisor, Dr. Jeffery Hurst

performed an evaluation of MORTEZA's performance for the first time in 6 years since

MORTEZA assumed the position of Director of ISSC.  PEROZZI was present during the

meeting and participated in this review.

**28.**    Even though the joint evaluation was performed, the performance evaluation was

never completed.

29.     On or about May 2010, PERROZZI became MORTEZA's direct supervisor due to the nepotistic practices WSU allowed.

30.     After PERROZI became MORTEZA's direct supervisor, MORTEZA attempted to educate PERROZI on WSU's policies and procedures and federal regulations regarding international students attending WSU.

31.     PERROZI ordered MORTEZA to treat WSU's international students differently based on the students' national origin.

32.     On numerous occasions, MORTEZA indicated to PEROZZI that the ISSC was under-staffed and MORTEZA needed more employees to assist in the growth of ISSC.

33.     PEROZZI approved MORTEZA's request to hire three additional staff positions to meet the needs of ISSC.

34.     On or about May 2011, MORTEZA was assigned by PEROZZI to travel to and recruit students from Turkey to attend WSU. Before MORTEZA's departure to Turkey, three positions were posted by WSU.

35.     After MORTEZA's return from Turkey on July 8, 2011, MORTEZA was scheduled to meet with WINNIFORD and PEROZZI.

36.     During the July 8, 2011 meeting, WINNIFORD and PEROZZI informed MORTEZA of the reorganization of the ISSC. With the new reorganization, they would no longer hire the previously agreed upon three staff positions. MORTEZA was told that since he was from the Middle East he would be the Saudi Student Advisor, and a newly created Executive Director was to supervise the ISSC office.

**37.** Upon MORTEZA's objection WINNIFORD indicated to MORTEZA that this was not a demotion. MORTEZA would continue to receive the same salary as if he were the Director of ISSC. However, he would no longer have any supervisory role or duties in ISSC.

**38.** In a subsequent meeting, after MORTEZA's repeated objection to the demotion, WINNIFORD reluctantly decided to let MORTEZA keep his title as Director at ISSC.

39. WINNIFORD and PERROZI indicated to MORTEZA that he could apply for the newly created position. If MORTEZA was selected as the new Executive Director of ISSC, WINNIFORD and PERROZI would not fill his Director position and would eliminate the position. However, if MORTEZA was not selected for the newly created Executive Director of ISSC, MORTEZA would be allowed to keep his current position as Director of ISSC. It is not common practice in WSU's STUDENT AFFAIRS division to have an Executive Director position.

**MORTEZA Experienced Discrimination During the Hiring Process for WSU's Newly Created Position of Executive Director of ISSC**

40. PERROZI deliberately formed a hiring committee mainly comprised of three Deans of Colleges, one Associative VP's, and one Associative Provost, one of which being PERROZI; at WSU it is unheard for a hiring committee to have so many Deans and VP's on the hiring committee. PERROZI exercised discrimination towards MORTEZA. Two of the Deans selected in the committee had previous disagreements with MORTEZA. These disagreements

were related to statutes that would have violated federal immigration regulations. PEROZZI knew of these disagreements when he selected the hiring committee.

41. MORTEZA's initial interview for the newly created position of Executive Director of ISSC was conducted via SKYPE. The SKYPE interview that PEROZZI set up was not ideal; the connection was poor and lost during the interview. As a result, the communication between both parties was extremely difficult. After MORTEZA's SKYPE interview, the hiring committee decided not to continue using SKYPE for the remaining interviews.

42. For the on campus interview for the newly created position of Executive Director of ISSC, PEROZZI exercised discrimination and retaliation. MORTEZA was the first candidate to be contacted for the on campus interviews and was only given a set time and date to interview. However other candidates were given a choice to select their interview time and dates.

43. During the hiring process, it was required for each candidate to meet with a committee of international students. These students were required to evaluate each candidate. However, PEROZZI discriminated and retaliated against MORTEZA by failing to collect and deliver the international student evaluations of MORTEZA to the hiring committee.

44. PERROZZI discriminated and retaliated against MORTEZA by offering him $5.00 to cover the cost of his breakfast two minutes prior to his interview. However, PEROZZI indicated to MORTEZA that other candidates were given airfare, hotel, and travel accommodations.

45.     During MORTEZA's interview, early in the morning with the hiring committee, many of the hiring committee members were late and came in halfway through MORTEZA's interview.

46.     During the presentation portion of the interview, Dr. Jefferey Steagall, one of the Deans serving in the hiring committee, had instructed the department chairs and directors of the John B. Goddard School of Business to attend MORTEZA's presentation.  The department chairs and directors of the John B. Goddard School of Business only attended MORTEZA's presentation and not any of the other candidate's presentations.

47.     After MORTEZA's interview with the hiring committee and before MORTEZA's presentation, PEROZZI modified the newly created Executive Director of ISSC position to report not only to STUDENT AFFAIRS but also to WSU's Continuing Education Department. The Dean of the Continuing Education Department, a member of the hiring committee, had previous disagreements with MORTEZA regarding federal immigration regulations.

48.     An international student who served on the hiring committee informed MORTEZA that PERROZI was leading and feeding other candidates questions and answers during the interview process.

49.     Joyce Karen Garcia, the only staff member serving on the hiring committee, was verbally and continually dismissed by PEROZZI during the hiring process for pointing out the importance of selecting a candidate with PDSO experience. PEROZZI knew that MORTEZA was the only candidate with PDSO experience out of all the candidates that applied.

50.     PEROZZI reprimanded Joyce Karen Garcia, the only staff member serving on the hiring committee, for not returning her rankings of the candidates to PEROZZI at a certain time. PEROZZI accused Joyce Karen Garcia for skewing the rankings of candidates because only her rankings were not turned in promptly.  However, it was later found that two additional hiring committee members turned in their rankings at a much later time.

51.     Ultimately due to PEROZZI's discrimination and retaliation of MORTEZA, GIBSON was hired as the new Executive Director of ISSC.  Prior to employment at WSU, GIBSON never had experience working in the Unites States in an international student officer role or capacity and never worked as a Designated School Official ("DSO"), PDSO, RO, or Alternative Responsible Officer ("ARO").  She was officially hired in December 2011 while MORTEZA was on vacation.

52.     MORTEZA filed a formal internal grievance with WSU Human Resources in regards to PEROZZI's discrimination and retaliation towards MORTEZA during the hiring process which was never addressed by WSU.

53.     While MORTEZA was on vacation late December 2011, PEROZZI informed GIBSON of MORTEZA's formal internal grievance against PERROZI.

**MORTEZA Was Discriminated and Retaliated Against By GIBSON Due to His National Origin and Religion and Was Forced to Work in A Hostile Work Environment.**

54.     On January 9, 2012, GIBSON was introduced to MORTEZA by PEROZZI as the new Executive Director of ISSC when MORTEZA returned from vacation.

55. On or about January 2012, MORTEZA met PEROZZI and GIBSON. After entering GIBSON's office, PEROZZI and GIBSON were discussing how to plant certain flower bulbs that GIBSON has purchased. PEROZZI turned to MORTEZA and said, "MORTEZA, you are a farmer and should know which direction the bulbs should be placed in the soil." MORTEZA found PEROZZI's racial comments very offensive.

56. On or around January 2012, GIBSON began a campaign of sending MORTEZA numerous position openings at other universities throughout the nation verbally and via email; GIBSON continually encouraged MORTEZA to apply for these positions. MORTEZA complained to WSU Human Resources regarding GIBSON's campaign of harassment towards MORTEZA. GIBSON seized sending job opening information via email but continued to do so verbally.

57. GIBSON traveled to Washington, DC at least twice and met with SEVIS officials while MORTEZA was officially the PDSO of WSU. Soon after, GIBSON took over all of MORTEZA's duties and responsibilities as the Director of ISSC. GIBSON controlled MORTEZA's staff meetings and dictated what MORTEZA could/should say in the meetings. GIBSON also ordered MORTEZA to take specific actions relating to SEVIS matters.

58. GIBSON started meeting one-on-one with MORTEZA's staff. GIBSON talked about raising their salary, demoting them, and firing them without any input from MORTEZA.

59. GIBSON did not allow MORTEZA to take a five-minute break during the day without GIBSON's permission.

60.     After MORTEZA explained to GIBSON that she was in violation of SEVIS and university policies, GIBSON ordered MORTEZA not to speak any longer in his staff meetings.

61.     GIBSON directed MORTEZA in one of the Directors and Program Head meetings, in the presence of his peers, that he didn't have to attend these meetings. GIBSON indicated since she was attending the meetings that MORTEZA should do something more productive with his time.

62.     GIBSON started greeting every student by saying to them *AsSalaamalaykum* regardless of their national origin or religion; this was very offensive to MORTEZA because GIBSON was personally attacking MORTEZA's religion. Students were also offended by these racist comments and behaviors.

63.     After a meeting, GIBSON asked MORTEZA "Did you see those White Supremacists?" MORTEZA replied "no" to GIBSON and GIBSON said "Oh, did I say that out loud?" GIBSON often made racist remarks. For example she referred to the Middle Easterners as Arabs. MORTEZA often had to explain to GIBSON that there were other nationalities beside Arabs in the Middle East. Also, GIBSON said that all the people in the Middle East were Muslims.

64.     On numerous occasions, GIBSON through email requested meeting with MORTEZA minutes before the actual meeting began. Many times MORTEZA was meeting with a student and was not able to check his email promptly resulting in MORTEZA missing the meetings.

65.     GIBSON began a series of one-on-one meetings with MORTEZA which lasted for many hours at a time.  These meetings consisted of GIBSON ridiculing, mocking, and belittling MORTEZA.  GIBSON's meetings with MORTEZA, over time, became and continued to be more abusive and intensified day by day.

66.     Because of the extreme demand and stress created by GIBSON, MORTEZA was forced to work through lunch hours and often worked 10-12 hour days without any break.

67.     Due to the tremendous stress and demands by GIBSON, MORTEZA was unable to sleep at night.  He was forced to seek a professional counselor and was encouraged to stop working and use FMLA.

68.     On his way home on March 30, 2012, after working an extremely stressful day from 5:30 a.m. to 5:30 p.m. without any break, MORTEZA was involved in a serious automobile accident south of WSU.  This forced MORTEZA to use FMLA.  GIBSON knew that MORTEZA was scheduled to return to his position on June 1, 2012.

69.     GIBSON and MORTEZA were scheduled to attend the Association of International Educators conference on June 1, 2012.  GIBSON knowing of MORTEZA's return from FMLA cancelled MORTEZA's June 1, 2012 conference registration.

70.     While on FMLA, during the first week of May 2012, MORTEZA went to WSU campus to perform PDSO duties.  GIBSON had arranged for MORTEZA to meet with WINNIFORD, PEROZZI, Richard Hill, and GIBSON in WINNIFORD's office.  In this meeting Richard Hill informed MORTEZA that his PDSO responsibilities were to be assigned to GIBSON while MORTEZA was on FMLA.  Richard Hill assured MORTEZA that upon

MORTEZA's return from FMLA, MORTEZA would resume his PDSO duties. However, upon MORTEZA's return on June 1, 2012, MORTEZA's PDSO responsibilities were not reinstated until several months later.

71.     GIBSON along with WSU violated policies and procedures as it relates to FMLA.

72.     While MORTEZA was on FMLA, GIBSON violated federal law and WSU's policies and procedures by unlawfully terminating 17 Saudi students and denying due process to them.

73.     GIBSON falsified several legal documents pertaining to international student records.

74.     When MORTEZA returned from FMLA, MORTEZA discussed the unlawful termination of Saudi students with GIBSON. GIBSON replied to MORTEZA "I am the PDSO and it is my prerogative".

75.     MORTEZA met with PEROZZI to discuss the unlawful termination of the Saudi students. However, PEROZZI sided with GIBSON even though GIBSON violated the policies and procedures of WSU and the federal government. Furthermore PEROZZI told MORTEZA that MORTEZA was being "destructive".

76.     Because of MORTEZA's national origin, GIBSON accused MORTEZA of showing favoritism toward Saudi students by issuing 1-20s to those "Arab students" so they can come to the United States to "just play and plot".

77.     MORTEZA requested WINNIFORD to come and meet with the ISSC staff and listen to the staffs concerns regarding GIBSON.  WINNIFORD initially agreed to attend the meetings and later assigned PEROZZI to do so on her behalf.

78.     PEROZZI scheduled to have one-on-one meetings with ISSC staff but only met with two of the staff members of the ISSC, Jeannie Pacheco and Rachel Preece.  PEROZZI failed to meet with the other ISCC staff members: MORTEZA and Joyce Karen Garcia.

79.     At the time, WINNIFORD and PEROZZI failed to address the unlawful termination of the 17 Saudi students.  MORTEZA then arranged multiple meetings with Dr. Ryan Thomas, Cherrie Nelson, Dr. Bruce Davis, Dr. Yas Simonian, and Barry Gomberg to discuss these unlawful terminations of 17 Saudi students.  Both Ryan Thomas and Cherrie Nelson reviewed the evidence and asked MORTEZA's permission to speak to Richard Hill.

80.     On June 28,2012, Cherrie Nelson agreed to be present in the meeting between MORTEZA, GIBSON, and PEROZZI to discuss the unlawful termination of 17 Saudi students. At that time PEROZZI still failed to acknowledge GIBSON's unlawful termination of 17 Saudi students from WSU.

81.     Sometime between June 28,2012 and July 16,2012, GIBSON was dismissed from WSU as the Executive Director of ISSC.

82.     On July 16, 2012, PEROZZI announced to the STUDENT AFFAIRS division that GIBSON had resigned from her position as Executive Director of ISSC effective that day.

83.     WINNIFORD repeated inaction to witnessed and reported hostility and discrimination, repeated failures to exercise reasonable care in supervision of ISSC, condoned

and sanctioned abusive, biased, and hostile work environment that was created by PEROZZI and GIBSON.

## PERROZI's Continuous Discrimination, Retaliation, and Creation of a Hostile Work Environment Towards MORTEZA

84.     After GIBSON's departure, PEROZZI held an ISSC staff meeting on July 31, 2012 during which he announced his decision to assume the PDSO responsibilities for WSU. This decision by PEROZZI contradicted Richard Hill's assurance in May of 2012 that MORTEZA would regain his PDSO responsibilities upon his return from his FMLA.

85.     As usual practice, PEROZZI pressured and ordered MORTEZA as a PDSO to unlawfully terminate international students from WSU.

86.      PEROZZI supported GIBSON's unlawful termination of 17 Saudi students. PEROZZI ordered MORTEZA to tamper legal documents that were falsified by GIBSON.

87.     After GIBSON's resignation from WSU, MORTEZA was encouraged by Cherrie Nelson and Steve Nabor to accept a newly created position of University Risk Manager.

**88.**     Shortly after MORTEZA's interview for the University Risk Manager position, PEROZZI had a one-on-one meeting with MORTEZA.  PEROZZI was under the impression MORTEZA was accepting the newly created position as the University Risk Manager.   When MORTEZA informed PEROZZI that he declined the position, PEROZZI demonstrated a panicked response.

**89.** As many more meetings that occurred between PEROZZI and MORTEZA, each meeting became more uncomfortable for MORTEZA. MORTEZA then requested Cherrie Nelson to attend the one-on-one meetings with PEROZZI.

90. During these meetings with PEROZZI and Cherrie Nelson, PEROZZI indicated MORTEZA was difficult to communicate with, questioned MORTEZA's emails and what MORTEZA said, and took all the communications with MORTEZA out of context.

91. During a one-on-one meeting on Friday, March 8, 2013 with PEROZZI and MORTEZA in the presence of Cherrie Nelson, PERROZI instructed MORTEZA to provide a copy of a form to PEROZZI by the end of the following week, March 15, 2013. On the following Wednesday, March 13, 2013, PERROZZI scheduled an unexpected one-on-one meeting with MORTEZA. During this meeting in the presence of Cherrie Nelson, PEROZZI handed a written reprimand to MORTEZA. PERROZI reprimanded MORTEZA in writing for the following: 1) for not altering GIBSON's falsifications of student records and documents, and 2) for not providing PEROZZI the form that was due two days later, March 15, 2013.

92. WSU's policies and procedures protocol in reprimanding employees first call for an oral reprimand. However PERROZI violated WSU's policies and procedures by reprimanding MORTEZA in a written form.

93. MORTEZA objected to PERROZI's written reprimand. MORTEZA asked Cherrie Nelson if she recalled the deadline PERROZI had set to be Friday, March 15, 2013. Cherrie Nelson confirmed that PERROZI did in fact set March 15, 2013 as the deadline.

94.     PEROZZI's discrimination and retaliation towards MORTEZA by providing MORTEZA a written reprimand was the last attempt to force MORTEZA into accepting the newly created University Risk Manager position with Steve Nabor.


**On or About April 2013, MORTEZA and His Staff Was Notified That Dr. Bruce Davis, Dean of Continuing Education, Would be the New Direct Supervisor of ISSC Until Further Notice**

95.     Dr. Bruce Davis's role was to evaluate the ISSC program and to make decisions on the future of the ISSC.

96.     On September 21, 2013, Dr. Bruce Davis announced his decision to appoint Dr. Cliff Nowell in the newly created position of Dean of International Programs and ISSC would be under his direction.  Reason behind this appointment was due to personal and professional conflict between Dr. Jeff Steagall, Dean of the John B. Goddard School of Business and Economics and his associate Dean Dr. Cliff Nowell.  Also Dr. Jeff Steagall was a member of the hiring committee of the position of Executive Director of ISSC and had a previous disagreement with MORTEZA regarding federal immigration regulations.

**MORTEZA Followed Proper Protocol by Filing an Internal Grievance Against PEROZZI and GIBSON's Repeated Discrimination, Retaliation, and Creation of a Hostile Work Environment for MORTEZA.**

*97.*    On or around 2013, MORTEZA had several meetings with Barry Gomberg, Director of Affirmative Action/Equal Opportunity of WSU. Barry Gomberg is the officer who hears all discriminatory or harassment complaints at WSU.

98.    Barry Gomberg assured MORTEZA a formal investigation would be conducted upon MORTEZA's claim. However, Barry Gomberg informed MORTEZA of his right to choose between an external investigation or an internal investigation.

99.    MORTEZA chose the external investigation option. However, the external investigator was personally affiliated with Barry Gomberg and showed bias towards Barry Gomberg.

100.    A written report from the external investigation and the findings of MORTEZA's allegations were supposed to be prepared and delivered to WSU and MORTEZA. However, no such reports have been provided to MORTEZA to date.

101.    WSU has failed to provide MORTEZA with due process through WSU's internal grievance as outlined in its policies and procedures manual. Moreover, WSU has failed to resolve MORTEZA's grievance under PPM 3-32 which states in part, "Weber State University is committed to providing an environment free from harassment and other forms of discrimination ..."

102.    On or around February 2014, MORTEZA had a meeting with Richard Hill and Amy Crosbie, WSU's Athletic Director.

103.    During this meeting Richard Hill, along with Amy Crosbie, attempted to persuade MORTEZA to violate WSU's and federal regulations to retain an international student who played tennis for WSU and had lost his F-1 status. MORTEZA had to terminate the international student who played tennis for WSU because he lost his F-1 status. Richard Hill advocated for this student not to be terminated and provided numerous accommodations for the student to be able to stay as an international student in good standing. Richard Hill, on the other hand, failed to get involved when GIBSON was terminating all the 17 Saudi students without due process.

104.    WSU has shown to follow two sets of standards.  The first standard being for Middle Eastern students and the second standard being for all other international students.  For instance, GIBSON terminated 17 Saudi students and at the same time did not apply the same harsh standards to the other international students.


### FIRST CAUSE OF ACTION

### National Origin Disparate Treatment Violation of Title VII (42 U.S.C. § 2000e-2) (WSU, PEROZZI, GIBSON, and WINNIFORD in Their Official Capacities)

105.    MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

106.    29 C.F.R. § 1606.1 defines "national origin" in the context of employment discrimination "broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an

individual has the physical, cultural or linguistic characteristics of a national origin group," and including allegations on the basis of "reasons which are grounded in national origin considerations," such as "because an individual's name. . .is associated with a national origin group."

107.    To establish a prima facie case of Title VII national origin discrimination, MORTEZA must prove that (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) the challenged action took place under circumstances giving rise to an inference of discrimination.

108.    MORTEZA was born in Zanjan, Iran.

109.    MORTEZA speaks with an accent immediately apparent to native English speakers.

110.    MORTEZA was qualified for the Executive Director position by virtue of his relevant master's degree and decades of experience in the area of international studies and knowledge of federal immigration as it dictates for international students in higher education.

111.    PEROZZI informed MORTEZA, before going to an assigned recruiting assignment to Turkey, three supporting staff positions were to be posted at WSU.

112.    WSU, PEROZZI, GIBSON, and WINNIFORD discriminated against MORTEZA in violation of Title VII when, because of his national origin:

   a.    The newly created Executive Director of ISSC position was posted; they did not want MORTEZA to apply;

b.  They demoted MORTEZA and informed MORTEZA that he would be the new Saudi Student Advisor;

c.  They made the application and interview process for the newly created Executive Director position more burdensome for MORTEZA compared to the other candidates;

d.  They comprised the hiring committee with two Deans who had previous disagreements with MORTEZA over federal immigration regulation as it regards to international students at WSU;

e.  During the interview process, student evaluations for MORTEZA were never collected or presented to the hiring committee;

f.  MORTEZA's initial interview for the newly created position of Executive Director of ISSC was via SKYPE while the other candidates were not.

g.  Two minutes before MORTEZA's on-campus interview, they offered MORTEZA $5.00 for his breakfast.  However, they compensated other candidates for their airfare, travel, hotel, and meals during the interview process;

h.  The majority of the hiring committee came in late during MORTEZA's interview;

i.  They discouraged MORTEZA when they announced that the newly created Executive Director would report to both Continuing Education Department and STUDENT AFFAIRS;

j. MORTEZA's presentation was attended with greater scrutiny than those of the other candidates;

k. MORTEZA was the only qualified candidate with extensive PDSO and RO experience in higher education amongst the candidates.

l. An ISSC staff member known to MORTEZA who was in the hiring committee was verbally reprimanded over time for her input in the importance of PDSO and RO experience in higher education for the newly created position of Executive Director of ISSC;

113.   In addition, WSU, PEROZZI, GIBSON, and WINNIFORD discriminated against MORTEZA in violation of Title VII when, because of his national origin:

a. On or around January 2012, MORTEZA met PEROZZI and GIBSON.  After entering GIBSON's office, PEROZZI and GIBSON were discussing how to plant certain flower bulbs that GIBSON has purchased.  PEROZZI turned to MORTEZA and said, "MORTEZA, you are a farmer and should know which direction the bulbs should be placed in the soil."

b. GIBSON began a campaign of sending MORTEZA job announcements in other institutions on a regular basis via email and verbally;

c. MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

d. GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

e. Due to the extreme bias GIBSON showed toward MORTEZA, MORTEZA was involved in a serious automobile accident;

f. After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

g. While MORTEZA left on FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return. However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure;

h. During MORTEZA's FMLA absence, GIBSON unlawfully terminated 17 Saudi students from WSU and denied them due process;

i. GIBSON continually mocked MORTEZA by using a greeting, *AsSalamalykum* which has sacred meaning for Muslims and GIBSON used it in an offensive manner;

j. GIBSON continually exhibited racist behaviors towards students at WSU. For example, while MORTEZA was present, GIBSON said "Did you see those Supremacists? Did I just say that out loud?';

k. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However, due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous requests;

l. GIBSON repeatedly and continuously verbally abused MORTEZA during many one-on-one meetings by belittling, ridiculing, and mocking MORTEZA; For example, GIBSON accused MORTEZA of favoring "Arab" students because of MORTEZA's national origin.

114. As the direct and proximate result of MORTEZA's discrimination from WSU, PERROZI, GIBSON, and WINNIFORD, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

115. As the additional results of such discrimination, MORTEZA has incurred attorney's fees, litigation expenses, and costs. He is therefore entitled to recover his attorney fees, expenses and costs pursuant to 42 U.S.C. §2000e-5.

116. In addition, GIBSON discriminated against MORTEZA in violation of Title VII because of his national origin and/or religion.

## SECOND CAUSE OF ACTION
### National Origin Hostile Work Environment in Violation of Title VII (42 U.S.C. § 2000e-2) (WSU, PERROZI, GIBSON, and WINNIFORD in Their Official Capacities)

**117.**     MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

118.     To establish a prima facie claim of a hostile work environment under Title VII on the basis of his national origin, MORTEZA must show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the [his] employment and create an abusive working environment," by evidence of (among other things) the conduct's frequency and severity, showing whether it was physically threatening or humiliating, and/or showing whether it unreasonably interfered with his work performance.

119.     WSU, PEROZZI, GIBSON, and WINNIFORD created a hostile work environment in violation of Title VII:

a.  On or around January 2012, MORTEZA met PEROZZI and GIBSON. After entering GIBSON's office, PEROZZI and GIBSON were discussing how to plant certain flower bulbs that GIBSON has purchased. PEROZZI turned to MORTEZA and said, "MORTEZA you are a farmer and you should know which direction the bulbs should be placed in the soil."

b.  GIBSON began a campaign of sending MORTEZA job announcements in other institutions on a regular basis via email and verbally;

c. MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

d. GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

e. Due to the extreme bias GIBSON showed toward MORTEZA, MORTEZA was involved in a serious automobile accident;

f. GIBSON demeaned and humiliated MORTEZA in the presence of his peers and colleagues.

g. After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

h. While MORTEZA left on FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return. However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure;

i. During MORTEZA's FMLA absence, GIBSON unlawfully terminated 17 Saudi students from WSU and denied them due process;

j. GIBSON started greeting every student by saying to them *AsSalaamalaykum* regardless of their national origin or religion; this was very offensive to MORTEZA because GIBSON was personally attacking MORTEZA's religion. Students were also offended by these racist comments and behaviors.

k. GIBSON continually exhibited racist behaviors towards students at WSU. For example, while MORTEZA was present, GIBSON said "Did you see those Supremacists? Did I just say that out loud?';

l. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However, due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous requests;

m. GIBSON repeatedly and continuously verbally abused MORTEZA during many one-on-one meetings by belittling, ridiculing, and mocking MORTEZA; For example, GIBSON accused MORTEZA of favoring "Arab" students because of MORTEZA's national origin.

n. GIBSON repeatedly mocked MORTEZA by stating again and again that "I am the Executive Director" during many one-on-one meetings;

o. GIBSON ordered MORTEZA not to talk to any other WSU officials without GIBSON's direct permission. Furthermore, MORTEZA was instructed not to speak in staff meetings and was dismissed from attending Directors and Program Head meetings.

p. After GIBSON's departure from WSU, MORTEZA was encouraged by Cherrie Nelson and Steve Nabor to interview for the newly created position of University Risk Manager. PEROZZI assumed that MORTEZA accepted the position and was surprised to find out that MORTEZA declined the WSU's newly created

position of University Risk Manager. PEROZZI wrongfully reprimanded MORTEZA in an effort to force him out of the ISSC department;

q. During these meetings with MORTEZA,PEROZZI indicated MORTEZA was difficult to communicate with, questioned MORTEZA's emails and what MORTEZA said, and took the communications with MORTEZA out of context;

r. During a one-on-one meeting on Friday, March 8,2013 with PEROZZI and MORTEZA in the presence of Cherrie Nelson, PERROZI instructed MORTEZA to provide a copy of a form to PEROZZI by the end of the following week, March 15,2013.

s. On the following Wednesday, March 13,2013, PERROZZI scheduled an unexpected one-on-one meeting with MORTEZA. During this meeting with the presence of Cherrie Nelson, PEROZI handed a written reprimand to MORTEZA. PERROZI reprimanded MORTEZA in writing for the following: 1) for not altering GIBSON's falsifications of student records and documents, and 2) for not providing PEROZZI the form that was due two days later, March 15, 2013.

t. PERROZI failed to follow WSU policies and procedures by not providing MORTEZA with a verbal reprimand first. Rather, PERROZI omitted a verbal reprimand and instead PERROZI provided a written reprimand. MORTEZA objected to PERROZI written reprimand. MORTEZA asked Cherrie Nelson if she recalled the deadline to submit the form that PEROZZI requested from

MORTEZA to be the end of the week. Cherrie Nelson confirmed the form requested was not due until March 15, 2013;

u. PEROZZI created a hostile work environment for MORTEZA by providing MORTEZA a written reprimand which is another attempt to force MORTEZA into accepting the newly created University Risk Manager position with Steve Nabor;

v. On or around February 2014, MORTEZA had a meeting with Richard Hill and WSU's Athletic Director Amy Crosbie. During this meeting, Richard Hill along with Amy Crosbie, attempted to persuade MORTEZA to violate WSU's and federal regulations to retain an international student who played tennis for WSU and had lost his F-1 status. MORTEZA had to terminate the international student who played tennis for WSU because he lost his F-1 status. Richard Hill advocated for this student not to be terminated and provided numerous accommodations for the student to be able to stay as an international student in good standing. Richard Hill, on the other hand, failed to get involved when GIBSON was terminating 17 Saudi students without due process;

w. WSU has shown to follow two sets of rules. The first standard being for Middle Eastern students and the second standard being for all other international students. For instance, GIBSON unlawfully terminated 17 Saudi students but did not follow the same procedures and standards as it pertained to the other international students.

x. As common practice, PEROZZI continually pressured and ordered MORTEZA as a PDSO to unlawfully terminate international students from WSU and correct GIBSON's unlawful termination of 17 Saudi students.

120. As further direct and proximate results of this hostile work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

121. As additional results of this hostile work environment, MORTEZA has incurred attorney's fees, litigation expenses, and costs. He is therefore entitled to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.

### THIRD CAUSE OF ACTION
### Retaliation in Violation of Title VII (42 U.S.C. § 2000e-3)
### (WSU, PERROZI, GIBSON, and WINNIFORD in Their Official Capacities)

122. MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

123. To establish a prima facie case of retaliation under Title VII, MORTEZA must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action that a reasonable employee would have found material; and (3) there is a causal connection between his opposition and the employer's adverse action.

124. On or around December 2011, MORTEZA filed a formal internal grievance with WSU Human Resources in regards to PEROZZI's discrimination and retaliation towards MORTEZA during the hiring process which was never properly completed by WSU.

125. While MORTEZA was on vacation late December 2011, PEROZZI informed GIBSON of MORTEZA's formal internal grievance against PERROZI.

126. WINNIFORD repeatedly did nothing about witnessed and reported hostility and discrimination, repeatedly failed to exercise reasonable care in supervision of ISSC, and condoned and sanctioned the abusive, biased, and retaliatory work environment created by PEROZZI and GIBSON.

127. WSU, PEROZZI, GIBSON, and WINNIFORD engaged retaliatory behavior in violation of Title VII:

    a. GIBSON began continually sending MORTEZA job announcements for other institutions on a regular basis via email and verbally;

    b. MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

    c. GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

    d. GIBSON demeaned and humiliated MORTEZA in the presence of his peers and colleagues.

    e. After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

f. While MORTEZA was on FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return. However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure from WSU;

g. GIBSON started greeting every student by saying to them *AsSalaamalaykum* regardless of their national origin or religion; this was very offensive to MORTEZA because GIBSON was personally attacking MORTEZA's religion. Students were also offended by these racist comments and behaviors.

h. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous email requests;

i. GIBSON began a series of one-on-one meetings with MORTEZA which lasted for many hours at a time. These meetings consisted of GIBSON ridiculing, mocking, and belittling MORTEZA. GIBSON's meetings with MORTEZA, over time, became and continued to be more abusive and intensified day by day;

j. GIBSON repeatedly mocked MORTEZA by stating frequently during one-on-one meetings that "I am the Executive Director...you're supervisor's didn't want you here as the director";

k. GIBSON ordered MORTEZA not to talk to any other WSU officials without GIBSON's direct permission. Furthermore, MORTEZA was instructed not to

speak in staff meetings and was dismissed from attending Directors and Program Head meetings.

1. After GIBSON's departure from WSU, MORTEZA was encouraged by Cherrie Nelson and Steve Nabor to interview for the newly created position of University Risk Manager. PEROZZI assumed that MORTEZA accepted the position and was surprised to find out that MORTEZA declined the WSU's newly created position of University Risk Manager;

m. During these meetings with MORTEZA, PEROZZI indicated MORTEZA was difficult to communicate with, questioned MORTEZA's emails and what MORTEZA said, and took the communications with MORTEZA out of context;

n. During a one-on-one meeting on Friday, March 8, 2013 with PEROZZI and MORTEZA, and in the presence of Cherrie Nelson, PERROZI instructed MORTEZA to provide a copy of a form to PEROZZI by the end of the following week, March 15, 2013.

o. On the following Wednesday, March 13, 2013, PEROZZI scheduled an unexpected one-on-one meeting with MORTEZA. During this meeting in the presence of Cherrie Nelson, PEROZZI handed a written reprimand to MORTEZA. PEROZZI reprimanded MORTEZA in writing for the following: 1) for not altering GIBSON's falsifications of student records and documents, and 2) for not providing PEROZZI the form that was due on March 15, 2013, two days later.

p. PEROZZI failed to follow WSU policies and procedures by not providing MORTEZA with a verbal reprimand first. Rather, PEROZZI omitted a verbal reprimand and provided a written reprimand instead. MORTEZA objected to PEROZZI's written reprimand. MORTEZA asked Cherrie Nelson if she recalled the deadline of the form that PEROZZI requested from MORTEZA to be the end of the week. Cherrie Nelson confirmed the form requested was not due until the end of the week which was Friday March 15, 2013;

q. PEROZZI created a hostile work environment for MORTEZA by providing MORTEZA a written reprimand which is another attempt to force MORTEZA into accepting the newly created University Risk Manager position with Steve Nabor;

r. As common practice, PEROZZI continually pressured and ordered MORTEZA as a PDSO to unlawfully terminate international students from WSU and correct GIBSON's unlawful tampering of student records.

128. On or around 2013, MORTEZA had several meetings with Barry Gomberg, Director of Affirmative Action/Equal Opportunity of WSU. Barry Gomberg is the officer that hears discriminatory or harassment complaints at WSU.

129. Barry Gomberg assured MORTEZA a formal investigation would be conducted upon MORTEZA's claim. However, Barry Gomberg indicated to MORTEZA that he had the right to choose an external investigation or an internal investigation.

130.     MORTEZA chose the option to have the external investigation.  However, the external investigator was personally affiliated with Barry Gomberg and showed bias towards Barry Gomberg.

131.     A written report from the external investigation and the findings of MORTEZA's allegations were supposed to be prepared and delivered to WSU and MORTEZA.  However no such reports have been provided to MORTEZA to date.

132.     WSU has failed to provide MORTEZA with due process through WSU's internal grievance as outlined in the policies and procedures manual.

133.     On or around February 2014, MORTEZA had a meeting with Richard Hill and WSU's Athletic Director Amy Crosbie. During this meeting, Richard Hill along with Amy Crosbie attempted to persuade MORTEZA to violate WSU's and federal regulations to not terminate an international student who played tennis for WSU and had lost his F-1 status.

134.     WSU has shown to follow two sets of standards.  The first standard being for Middle Eastern students and the second standard being for all other international students.  For instance, GIBSON terminated 17 Saudi students and at the same time did not apply the same harsh standards to the other international students. Richard Hill, on the other hand, did not get involved when GIBSON was terminating all these students without due process.  However, when MORTEZA had to terminate an international student who played for WSU tennis because he lost his F-1 status, Richard Hill advocated for this student not to be terminated and provided numerous accommodations for the student to be able to stay as an international student in good standing.

## FOURTH CAUSE OF ACTION
## Conspiracy of National Origin Dispt Treatment Violation of Title VII
## (42 U.S.C. § 2000e-2)
## (WSU, PEROZZI, GIBSON, and WINNIFORD in their official capacities)

135.    MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

136.    In title VII it states that where "two or more persons in any State conspire...for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, …if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

137.    PEROZZI informed MORTEZA, before going to an assigned recruiting assignment to Turkey, three supporting staff positions were to be posted at WSU.

138.    WSU, PEROZZI, GIBSON, and WINNIFORD conspired to discriminate against MORTEZA in violation of Title VII because of his national origin:

    a.    The newly created Executive Director of ISSC position was posted; they did not want MORTEZA to apply;

    b.    They demoted MORTEZA and informed MORTEZA that he would be the new Saudi Student Advisor;

c. They made the application and interview process for the newly created Executive Director position more burdensome for MORTEZA compared to the other candidates;

d. They comprised the hiring committee with two Deans who had previous disagreements with MORTEZA over federal immigration regulation as it regards to international students at WSU;

e. During the interview process, student evaluations for MORTEZA were never collected or presented to the hiring committee;

f. MORTEZA's initial interview for the newly created position of Executive Director of ISSC was via SKYPE while the other candidates were not.

g. Two minutes before MORTEZA's on-campus interview, they offered MORTEZA $5.00 for his breakfast. However, they compensated other candidates for their airfare, travel, hotel, and meals during the interview process;

h. The majority of the hiring committee came in late during MORTEZA's interview;

i. They discouraged MORTEZA when they announced that the newly created Executive Director would report to both Continuing Education Department and STUDENT AFFAIRS;

j. MORTEZA's presentation was attended with greater scrutiny than those of the other candidates;

k. MORTEZA was the only qualified candidate with extensive PDSO and RO experience in higher education amongst the candidates.

1. An ISSC staff member known to MORTEZA who was in the hiring committee was verbally reprimanded over time for her input on the importance of PDSO and RO experience in higher education for the newly created position of Executive Director of ISSC;

139.    In addition, WSU, PEROZZI, GIBSON, and WINNIFORD conspired to discriminate against MORTEZA in violation of Title VII because of his national origin:

a. On or around January 2012, MORTEZA met PEROZZI and GIBSON. After entering GIBSON's office, PEROZZI and GIBSON were discussing how to plant certain flower bulbs that GIBSON has purchased. PEROZZI turned to MORTEZA and said, "MORTEZA, you are a farmer and should know which direction the bulbs should be placed in the soil."

b. GIBSON began a campaign of sending MORTEZA job announcements in other institutions on a regular basis via email and verbally;

c. MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

d. GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

e. Due to the extreme bias GIBSON showed toward MORTEZA, MORTEZA was involved in a serious automobile accident;

f. After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

g. While MORTEZA left on FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return. However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure;

h. During MORTEZA's FMLA absence, GIBSON unlawfully terminated 17 Saudi students from WSU and denied them due process;

i. GIBSON continually mocked MORTEZA by using a greeting, *AsSalamalykum* which has sacred meaning for Muslims and GIBSON used it in an offensive manner;

j. GIBSON continually exhibited racist behaviors towards students at WSU. For example, while MORTEZA was present, GIBSON said "Did you see those Supremacists? Did I just say that out loud?";

k. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However, due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous requests;

l. GIBSON repeatedly and continuously verbally abused MORTEZA during many one-on-one meetings by belittling, ridiculing, and mocking MORTEZA; For example, GIBSON accused MORTEZA of favoring "Arab" students because of MORTEZA's national origin.

140.    As the direct and proximate result of WSU, PEROZZI, GIBSON, and
WINNIFORD's conspiracy to discriminate against MORTEZA, MORTEZA has suffered
extensive damages including physical suffering, emotional pain, inconvenience, mental anguish,
depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive
damages in an amount to be determined at trial.

141.    As the additional results of such discrimination, MORTEZA has incurred
attorney's fees, litigation expenses, and costs.  He is therefore entitled to recover his attorney
fees, expenses and costs pursuant to 42 U.S.C. §2000e-5.

142.    In addition, WSU, PEROZZI, GIBSON, and WINNIFORD's conspiracy to
discriminate against MORTEZA in violation of Title VII because of his national origin and/or
religion.

### FIFTH CAUSE OF ACTION
### Conspiracy of National Origin Hostile Work Environment in Violation of Title VII
### (42 U.S.C. § 2000e-2)
### (WSU, PERROZI, GIBSON, and WINNIFORD in their official capacities)

143.    MORTEZA incorporates by this reference each and every allegation of the
preceding paragraphs as if alleged in full herein:

144.    In title VII it states that where "two or more persons in any State conspire…for
the purpose of depriving, either directly or indirectly, any person or class of persons of the equal
protection of the laws, or of equal privileges and immunities under the laws, …if one or more
persons engaged therein do, or cause to be done, any act in furtherance of the object of such
conspiracy, whereby another is injured in his person or property, or deprived of having and

exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

145.    WSU, PEROZZI, GIBSON, and WINNIFORD conspired to create a hostile work environment in violation of Title VII:

     a .  On or around January 2012, MORTEZA met PEROZZI and GIBSON.  After entering GIBSON's office, PEROZZI and GIBSON were discussing how to plant certain flower bulbs that GIBSON has purchased.  PEROZZI turned to MORTEZA and said, "MORTEZA you are a farmer and you should know which direction the bulbs should be placed in the soil."

     b.  GIBSON began a campaign of  sending MORTEZA job announcements in other institutions on a regular basis via email and verbally;

     c.  MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

     d.  GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

     e.  Due to the extreme bias GIBSON showed toward MORTEZA, MORTEZA was involved in a serious automobile accident;

     f.  After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

g. While MORTEZA left on FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return. However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure;

h. During MORTEZA's FMLA absence, GIBSON unlawfully terminated 17 Saudi students from WSU and denied them due process;

i. GIBSON continually mocked MORTEZA by using a greeting, *AsSalamalykum* which has sacred meaning for Muslims and GIBSON used it in an offensive manner;

j. GIBSON continually exhibited racist behaviors towards students at WSU. For example, while MORTEZA was present, GIBSON said "Did you see those Supremacists? Did I just say that out loud?';

k. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However, due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous requests;

l. GIBSON repeatedly and continuously verbally abused MORTEZA during many one-on-one meetings by belittling, ridiculing, and mocking MORTEZA; For example, GIBSON accused MORTEZA of favoring "Arab" students because of MORTEZA's national origin.

m. GIBSON repeatedly mocked MORTEZA by stating again and again that "I am the Executive Director" during many one-on-one meetings;

n. GIBSON ordered MORTEZA not to talk to any other WSU officials without GIBSON's direct permission. Furthermore, MORTEZA was instructed not to speak in staff meetings and was dismissed from attending Directors and Program Head meetings.

o. After GIBSON's departure from WSU, MORTEZA was encouraged by Cherrie Nelson and Steve Nabor to interview for the newly created position of University Risk Manager. PEROZZI assumed that MORTEZA accepted the position and was surprised to find out that MORTEZA declined the WSU's newly created position of University Risk Manager. PEROZZI wrongfully reprimanded MORTEZA in an effort to force him out of the ISSC department;

p. During these meetings with MORTEZA, PEROZZI indicated MORTEZA was difficult to communicate with, questioned MORTEZA's emails and what MORTEZA said, and took the communications with MORTEZA out of context;

q. During a one-on-one meeting on Friday, March 8, 2013 with PEROZZI and MORTEZA in the presence of Cherrie Nelson, PEROZZI instructed MORTEZA to provide a copy of a form to PEROZZI by the end of the following week, March 15,2013.

r. On the following Wednesday, March 13,2013, PEROZZI scheduled an unexpected one-on-one meeting with MORTEZA. During this meeting with the

presence of Cherrie Nelson, PEROZZI handed a written reprimand to MORTEZA. PEROZZI reprimanded MORTEZA in writing for the following: 1) for not altering GIBSON's falsifications of student records and documents, and 2) for not providing PEROZZI the form that was due two days later, March 15, 2013.

s. PEROZZI failed to follow WSU policies and procedures by not providing MORTEZA with a verbal reprimand first. Rather, PEROZZI omitted a verbal reprimand and instead PEROZZI provided a written reprimand. MORTEZA objected to PEROZZI written reprimand. MORTEZA asked Cherrie Nelson if she recalled the deadline to submit the form that PEROZZI requested from MORTEZA to be the end of the week. Cherrie Nelson confirmed the form requested was not due until March 15,2013;

t. PEROZZI created a hostile work environment for MORTEZA by providing MORTEZA a written reprimand which is another attempt to force MORTEZA into accepting the newly created University Risk Manager position with Steve Nabor;

u. On or around February 2014, MORTEZA had a meeting with Richard Hill and WSU's Athletic Director Amy Crosbie. During this meeting, Richard Hill along with Amy Crosbie, attempted to persuade MORTEZA to violate WSU's and federal regulations to retain an international student who played tennis for WSU and had lost his F-1 status. MORTEZA had to terminate the international student

who played tennis for WSU because he lost his F-1 status. Richard Hill advocated for this student not to be terminated and provided numerous accommodations for the student to be able to stay as an international student in good standing. Richard Hill, on the other hand, failed to get involved when GIBSON was terminating 17 Saudi students without due process;

v.  WSU has shown to follow two sets of rules.  The first standard being for Middle Eastern students and the second standard being for all other international students. For instance, GIBSON unlawfully terminated 17 Saudi students but did not follow the same procedures and standards as it pertained to the other international students.

w.  As common practice, PEROZZI continually pressured and ordered MORTEZA as a PDSO to unlawfully terminate international students from WSU and correct GIBSON's unlawful termination of 17 Saudi students.

146.    As further direct and proximate results of this hostile work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

147.    As additional results of this hostile work environment, MORTEZA has incurred attorney's fees, litigation expenses, and costs.  He is therefore entitled to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.

## SIXTH CAUSE OF ACTION
### Conspiracy of Retaliation in Violation of Title VII (42 U.S.C. § 2000e-3)
### (WSU, PERROZI, GIBSON, and WINNIFORD in Their Official Capacities)

148.   MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

149.   WSU, PEROZZI, GIBSON, and WINNIFORD conspired to engage in retaliatory behavior in violation of Title VII:

    a.   GIBSON began continually sending MORTEZA job announcements for other institutions on a regular basis via email and verbally;

    b.   MORTEZA was forced to work over 12 hours on a daily basis without receiving breaks or lunch hours;

    c.   GIBSON required MORTEZA to report his minute to minute activities from the time MORTEZA arrived in the morning until MORTEZA left for the evening;

    d.   GIBSON demeaned and humiliated MORTEZA in the presence of his peers and colleagues.

    e.   After MORTEZA officially filed for FMLA, GIBSON canceled MORTEZA's scheduled Association of International Educators conference;

    f.   While MORTEZA was in FMLA, MORTEZA was stripped of his PDSO responsibility and was promised that his PDSO responsibility would be reinstated upon MORTEZA's return.  However, MORTEZA's PDSO responsibilities were not returned to him until several months after GIBSON's departure from WSU;

g. GIBSON started greeting every student by saying to them *AsSalaamalaykum* regardless of their national origin or religion; this was very offensive to MORTEZA because GIBSON was personally attacking MORTEZA's religion. Students were also offended by these racist comments and behaviors.

h. GIBSON repeatedly emailed MORTEZA for impromptu meetings minutes before GIBSON wanted to meet with MORTEZA. However due to MORTEZA's heavy work load, MORTEZA was not able to respond promptly to GIBSON's spontaneous email requests;

i. GIBSON began a series of one-on-one meetings with MORTEZA which lasted for many hours at a time. These meetings consisted of GIBSON ridiculing, mocking, and belittling MORTEZA. GIBSON's meetings with MORTEZA, over time, became and continued to be more abusive and intensified day by day;

j. GIBSON repeatedly mocked MORTEZA by stating frequently during one-on-one meetings that "I am the Executive Director...you're supervisor's didn't want you here as the director";

k. GIBSON ordered MORTEZA not to talk to any other WSU officials without GIBSON's direct permission. Furthermore, MORTEZA was instructed not to speak in staff meetings and was dismissed from attending Directors and Program Head meetings.

1. After GIBSON's departure from WSU, MORTEZA was encouraged by Cherrie Nelson and Steve Nabor to interview for the newly created position of University

Risk Manager. PEROZZI assumed that MORTEZA accepted the position and was surprised to find out that MORTEZA declined the WSU's newly created position of University Risk Manager;

m.  During these meetings with MORTEZA, PEROZZI indicated MORTEZA was difficult to communicate with, questioned MORTEZA's emails and what MORTEZA said, and took the communications with MORTEZA out of context;

n.  During a one-on-one meeting on Friday, March 8, 2013 with PEROZZI and MORTEZA, and in the presence of Cherrie Nelson, PEROZZI instructed MORTEZA to provide a copy of a form to PEROZZI by the end of the following week, March 15, 2013.

o.  On the following Wednesday, March 13, 2013, PEROZZI scheduled an unexpected one-on-one meeting with MORTEZA. During this meeting in the presence of Cherrie Nelson, PEROZZI handed a written reprimand to MORTEZA. PEROZZI reprimanded MORTEZA in writing for the following: 1) for not altering GIBSON's falsifications of student records and documents, and 2) for not providing PEROZZI the form that was due on March 15, 2013, two days later.

p.  PEROZZI failed to follow WSU policies and procedures by not providing MORTEZA with a verbal reprimand first. Rather, PEROZZI omitted a verbal reprimand and provided a written reprimand instead. MORTEZA objected to PEROZZI's written reprimand. MORTEZA asked Cherrie Nelson if she recalled

the deadline of the form that PEROZZI requested from MORTEZA to be the end
of the week.  Cherrie Nelson confirmed the form requested was not due until the
end of the week which was Friday March 15,2013;

q. PEROZZI created a hostile work environment for MORTEZA by providing
MORTEZA a written reprimand which is another attempt to force MORTEZA
into accepting the newly created University Risk Manager position with Steve
Nabor;

r. As common practice, PEROZZI continually pressured and ordered MORTEZA as
a PDSO to unlawfully terminate international students from WSU and correct
GIBSON's unlawful tampering of student records.

150. On or around 2013, MORTEZA had several meetings with Barry Gomberg,
Director of Affirmative Action/Equal Opportunity of WSU. Barry Gomberg is the officer that
hears discriminatory or harassment complaints at WSU.

151. Barry Gomberg assured MORTEZA a formal investigation would be conducted
upon MORTEZA's claim.  However, Barry Gomberg indicated to MORTEZA that he had the
right to choose an external investigation or an internal investigation.

152. MORTEZA chose the option to have the external investigation.  However, the
external investigator was personally affiliated with Barry Gomberg and showed bias towards
Barry Goniberg.

153.     A written report from the external investigation and the findings of MORTEZA's allegations were supposed to be prepared and delivered to WSU and MORTEZA.  However no such reports have been provided to MORTEZA to date.

154.     WSU has failed to provide MORTEZA with due process through WSU's internal grievance as outlined in the policies and procedures manual.

155.     On or around February 2014, MORTEZA had a meeting with Richard Hill and WSU's Athletic Director Amy Crosbie. During this meeting, Richard Hill along with Amy Crosbie attempted to persuade MORTEZA to violate WSU's and federal regulations to not terminate an international student who played tennis for WSU and had lost his F-1 status.

156.     WSU has shown to follow two sets of standards.  The first standard being for Middle Eastern students and the second standard being for all other international students.  For instance, GIBSON terminated 17 Saudi students and at the same time did not apply the same harsh standards to the other international students. Richard Hill, on the other hand, did not get involved when GIBSON was terminating all these students without due process.  However, when MORTEZA had to terminate an international student who played for WSU tennis because he lost his F-1 status, Richard Hill advocated for this student not to be terminated and provided numerous accommodations for the student to be able to stay as an international student in good standing.

157.     As further direct and proximate results of this hostile work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain,

inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA

to compensatory and punitive damages in an amount to be determined at trial.

158.    As additional results of this hostile work environment, MORTEZA has incurred

attorney's fees, litigation expenses, and costs.  He is therefore entitled to recover his attorney

fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.

**SEVENTH CAUSE OF ACTION**
**Equal Protection Violation of the Fourteenth Amendment on the Basis of National Origin**
**(42 U.S.C. § 1983)**
**(WSU, PEROZZI, GIBSON, and WINNIFORD in Their Official Capacities)**

159.    MORTEZA incorporates by this reference each and every allegation of the

preceding paragraphs as if alleged in full herein:

160.    The Equal Protection Clause of the Fourteenth Amendment guarantees that "no

states shall. . .deny to any person within its jurisdiction the equal protection of the laws." *U.S.*

*Const.* amend. *XIV.*

161.    WSU, PEROZZI, GIBSON, and WINNIFORD engaged in depriving MORTEZA

of equal protection under the Fourteenth Amendment:

162.    MORTEZA was born in Zanjan, Iran.

163.    MORTEZA speaks with an accent immediately apparent to native English

speakers.

164.    MORTEZA was qualified for the Executive Director position by virtue of his

relevant master's degree and years of experience in the area of international education and

knowledge of federal immigration as it relates to international students in higher education.

165.     MORTEZA's initial interview for the newly created position of Executive
Director of ISSC was conducted via SKYPE.  The SKYPE interview that PEROZZI set
up was not ideal; the connection was poor and lost during the interview.  As a result, the
communication between both parties was extremely difficult. After MORTEZA's
SKYPE interview, the hiring committee decided not to continue using SKYPE for the
remaining interviews.

166.     For the on campus interview for the newly created position of Executive Director
of ISSC, PEROZZI exercised discrimination and retaliation.  MORTEZA was the first candidate
to be contacted for the on campus interviews and was only given a set time and date to interview.
However other candidates were given a choice to select their interview time and dates.

167.     During the hiring process, it was required for each candidate to meet with a panel
of international students.  These students were required to evaluate each candidate. However,
PEROZZI discriminated and retaliated against MORTEZA by failing to collect and deliver the
international student evaluations of MORTEZA to the hiring committee.

168.     PEROZZI discriminated and retaliated against MORTEZA by offering him $5.00
to cover the cost of his breakfast two minutes prior to his interview.  However, PEROZZI
indicated to MORTEZA that other candidates were given airfare, hotel, and travel
accommodations.

169.     During MORTEZA's interview, early in the morning with the hiring committee,
many of the hiring committee members were late and came in halfway through MORTEZA's
interview.

170. During the time GIBSON was Executive Director, she received a salary which nearly doubled MORTEZAs even though MORTEZA had more years of relevant experience.

171. GIBSON lacked experience in International Education in the United States, experience working with SEVIS and as the PDSO, and lacked knowledge of WSU's policies and procedures.

172. PEROZZI treated MORTEZA differently from others that report to him. For example, when MORTEZA complained about major issues with GIBSON's retaliation PEROZZI ignored the complaint but when other staff members complained to PEROZZI about minor issues, he took the complaints straight to HR.

173. PEROZZI has continuously ignored the authority and responsibility of MORTEZA as a director, PDSO, and RO. For example, PEROZZI ordered MORTEZA to terminate a student's status and in doing so, completely disregarded MORTEZA's expertise and knowledge in acting out his responsibilities as the Director, PDSO, and RO.

174. While GIBSON assumed PDSO responsibilities, GIBSON received PEROZZI's absolute support even when GIBSON incompetently and unlawfully terminated 17 Saudi students. On the other hand, PEROZZI refused to support MORTEZA when MORTEZA followed the proper protocol with SEVIS in many other occasions.

175. As further direct and proximate lack of equal protection in the work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

176.     As additional results of this unequal protection in the work environment,

MORTEZA has incurred attorney's fees, litigation expenses, and costs.  He is therefore entitled

to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.


**EIGHTH CAUSE OF ACTION**
**Conspiracy to Deprive Equal Protection Under the Fourteenth Amendment on the Basis of**
**National Origin (42 U.S.C. 8 1985(3))**
**(WSU, PEROZZI, GIBSON, and WINNIFORD in Their Official Capacities)**


177.     MORTEZA incorporates by this reference each and every allegation of the

preceding paragraphs as if alleged in full herein:

178.     42 U.S.C. §1985(3) states that where "two or more persons in any State

conspire...for the purpose of depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges and immunities under the laws,

…if one or more persons engaged therein do, or cause to be done, any act in furtherance of the

object of such conspiracy, whereby another is injured in his person or property, or deprived of

having and exercising any right or privilege of a citizen of the United States, the party so injured

or deprived may have an action for the recovery of damages occasioned by such injury or

deprivation, against any one or more of the conspirators."

179.     WSU, PEROZZI, GIBSON, and WINNIFORD conspired to deprive MORTEZA

of equal protection under the Fourteenth Amendment:

**180.**     MORTEZA's initial interview for the newly created position of Executive

Director of ISSC was conducted via SKYPE.  The SKYPE interview that PEROZZI set up was

not ideal; the connection was poor and lost during the interview. As a result, the communication between both parties was extremely difficult. After MORTEZA's SKYPE interview, the hiring committee decided not to continue using SKYPE for the remaining interviews.

181. For the on campus interview for the newly created position of Executive Director of ISSC, PEROZZI exercised discrimination and retaliation. MORTEZA was the first candidate to be contacted for the on campus interviews and was only given a set time and date to interview. However other candidates were given a choice to select their interview time and dates.

182. During the hiring process, it was required for each candidate to meet with a panel of international students. These students were required to evaluate each candidate. However, PEROZZI discriminated and retaliated against MORTEZA by failing to collect and deliver the international student evaluations of MORTEZA to the hiring committee.

183. PEROZZI conspired to discriminate and retaliate against MORTEZA by offering him $5.00 to cover the cost of his breakfast two minutes prior to his interview. However, PEROZZI indicated to MORTEZA that other candidates were given airfare, hotel, and travel accommodations.

184. During MORTEZA's interview, early in the morning with the hiring committee, many of the hiring committee members were late and came in halfway through MORTEZA's interview.

185. During the time GIBSON was Executive Director, she received a salary which nearly doubled MORTEZA's even though MORTEZA had more years of relevant experience.

186.     GIBSON lacked experience in International Education in the United States, experience working with SEVIS and as the PDSO, and lacked knowledge of WSU's policies and procedures.

187.     PEROZZI treated MORTEZA differently from others that report to him. For example, when MORTEZA complained about major issues with supervisor GIBSON's retaliation PEROZZI ignored the complaint but when other staff members complained to PEROZZI about minor issues, he took the complaints straight to HR.

**188.**     PEROZZI has continuously ignored the authority and responsibility of MORTEZA as a director, PDSO, and RO. For example, PEROZZI ordered MORTEZA to terminate a student's status and in doing so, completely disregarded MORTEZA's expertise and knowledge in acting out his responsibilities as the Director, PDSO, and RO.

189.     While GIBSON assumed PDSO responsibilities, GIBSON received PEROZZI's absolute support even when GIBSON incompetently and unlawfully terminated 17 Saudi students. On the hand, PEROZZI refused to support MORTEZA when MORTEZA followed the proper protocol with SEVIS in any other occasion.

190.     After WINNIFORD and PEROZZI informed MORTEZA of the reorganization of the ISSC office, WINNIFORD agreed for MORTEZA to keep his title, but in practice, MORTEZA was stripped of all his duties of the Director position.

191.     After a request from MORTEZA, WINNIFORD agreed to meet with MORTEZA's staff regarding the mistreatment by GIBSON and PEROZZI towards the entire

ISSC staff. WINNIFORD did not come to the meeting and instead designated PEROZZI to take her place in said meeting.

192.    WINNIFORD repeated inaction to witnessed and reported hostility and discrimination, repeated failures to exercise reasonable care in supervision of ISSC, condoned and sanctioned abuse and bias, and failed to address an equal protection work environment in regards to PEROZZI and GIBSON.

193.    On or about April 22,2010, MORTEZA's supervisor, Dr. Jeffery Hurst performed an evaluation of MORTEZA's performance for the first time in 6 years since MORTEZA assumed the position of Director of ISSC.  WSU incorporates employee performance evaluation into employee receiving merit increases. Because MORTEZA never received a performance evaluation, he was never given the opportunity to receive merit increases.

194.    As further direct and proximate lack of equal protection in the work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

195.    As additional results of this unequal protection in the work environment, MORTEZA has incurred attorney's fees, litigation expenses, and costs.  He is therefore entitled to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.

## NINTH CAUSE OF ACTION
## Due Process Violation of the Fourteenth Amendment
## (42 U.S.C. § 1983)
## (WSU, PERROZI, GIBSON, and WINNIFORD in Their Official Capacities)

196.    MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

197.    The Fourteenth Amendment protects against action under color of state law that violates an individual's due process rights.

198.    MORTEZA must prove that his rights, which were "clearly established" by federal statute or the United States Constitution at the time, were violated with "deliberate indifference" to or "reckless disregard" for his rights, or in a manner that "shocks the conscience."

199.    WSU, PEROZZI, GIBSON, and WINNIFORD deprived MORTEZA of equal protection under the Fourteenth Amendment.

200.    On or about April 22, 2010, MORTEZA's supervisor, Dr. Jeffery Hurst performed an evaluation of MORTEZA's performance for the first time in 6 years since MORTEZA assumed the position of Director of ISSC. WSU incorporates employee performance evaluation into employee receiving merit increases. Because MORTEZA never received a performance evaluation, he was never given the opportunity to receive merit increases.

201.    MORTEZA filed a formal grievance against PEROZZI for the hiring process he was engaged in for the Executive Director Position in the ISSC office.

202.    MORTEZA made a formal complaint with Mr. Barry Gomberg regarding GIBSON ~~and PEROZZI's discrimination, harassment, and creation~~ of a hostile work environment.

203.    Following several meetings with Barry Gomberg, an external investigation was conducted, the result of which was never shared with MORTEZA. During the external investigation it became clear that the investigator had personal connection to and showed bias toward Barry Gomberg.

204.    WSU's policies and procedures state that when a grievance is not completely resolved, the staff members have the right to go before the Personal Review Committee (PRC). As of to date, MORTEZA has been denied the opportunity to be heard by the PRC.

205.    WSU has failed to provide MORTEZA with due process through WSU's internal grievance as outlined in its policies and procedures manual.  Moreover, WSU has failed to resolve MORTEZA's grievance under PPM 3-32 which states in part, "Weber State University is committed to providing an environment free from harassment and other forms of discrimination

206.    As further direct and proximate lack of due process in the work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

207. As additional results of this lack of due process in the work environment, MORTEZA has incurred attorney's fees, litigation expenses, and costs. He is therefore entitled to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e-5.

**TENTH CAUSE OF ACTION**
**Conspiracy to Deprive Due Process Violation of the Fourteenth Amendment**
**(42 U.S.C. § 1983)**
**(WSU, PERROZI, GIBSON, and WINNIFORD in Their Official Capacities)**

208. MORTEZA incorporates by this reference each and every allegation of the preceding paragraphs as if alleged in full herein:

209. Conspiracy to deprive MORTEZA of the Due Process which is stated in the Fourteenth Amendment.

210. WSU, PEROZZI, GIBSON, and WINNIFORD conspired to deprive MORTEZA of due process under the Fourteenth Amendment.

211. WSU through its legal officials conspired to prevent the resolution of MORTEZA's formal internal grievances along with his discrimination, retaliation, and work related harassment.

212. On numerous occasions, legal council at WSU, attempted and still to this day try to contact MORTEZA when they had knowledge that MORTEZA had retained legal counsel.

213. Even as recent as, June 20,2014, WSU's legal council is trying to schedule another external investigation without providing any information of the scope of the investigation.

214.     WSU hired an external investigator who had personal connections with Barry Gomberg.

215.     As further direct and proximate conspiracy to deprive due process in the work environment, MORTEZA has suffered extensive damages including physical suffering, emotional pain, inconvenience, mental anguish, depression, and loss of enjoyment of life, entitling MORTEZA to compensatory and punitive damages in an amount to be determined at trial.

216.     As additional results of this conspiracy to deprive due process in the work environment, MORTEZA has incurred attorney's fees, litigation expenses, and costs.  He is therefore entitled to recover his attorney fees, expenses and costs, pursuant to 42 U.S.C. §2000e.


## .IEF REQUESTED

WHEREFORE, the plaintiff prays this Court:

1.     Accepts jurisdiction over this matter;

2.     Empanels a jury with respect to the causes of action;

3.     Enters a declaratory judgment that the practices complained of in this Complaint are unlawful and violate Title VII;

4.     Enters a declaratory judgment that the practices of named Defendants in their official capacity are unlawful and violate Title VII;

5.     Grants appropriate injunctive relief necessary to bring the relevant Defendants' actions and/or policies into compliance with the aforementioned laws;

**6.**     As to all Counts, awards MORTEZA's costs and reasonable attorney's fees incurred in this action; and,

**7.**     As to all Counts, grants any other relief which this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED this 24 day of July, 2014.

_____
ZACHARY C. HOLBROOK,
Attorney for Plaintiff

## DECLARATION UNDER PENALTY OF PERJURY

Personally appeared before me this day _24_ of _June_ 2014, the above named MORTEZA EMAMI, to me known to be the person who executed the foregoing instrument and acknowledged the same and declares under penalty of perjury that the information herein is true and correct.

DATED this _24_ day of _June_, 2014.

ZACHARY DAN JONES
Notary Public • State of Utah
Commission # 658601
COMM. EXP. 09-01-2016

_____
Morteza Emami

_____
Notary Public



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Phoenix District Office**

3300 N. Central Avenue, Suite 690
Phoenix, AZ 85012-2504
Phoenix Direct Dial: (602) 640-5000
TTY (602) 640-5072
FAX (602) 640-5071

Morteza Emami
C/O Eric E. Vickers, Attorney At Law
1100 Wyoming
Saint Louis, MO 63118

Subject: Dismissal of Charge

Charge Number: 540-2014-00133

Dear Morteza Emami:

We have completed a preliminary review of your case. At this time, the information in the file does not indicate that any further investigation of your case would necessarily result in any finding of discrimination. Consequently, we have decided that the Equal Employment Opportunity Commission (EEOC) will not investigate this case any further. This letter, and the enclosed documents, will dismiss your case from further action by the EEOC.

This dismissal is not a statement on the merits of your case. You still have rights under Federal law to privately pursue this matter in Federal Court. We have enclosed a Dismissal and Notice of Right to Sue form with this letter. This form will explain your rights. Please note that *you have only 90 days from the date that delivery of the Notice was attempted at your last known address of record or 90 days of receipt of the Notice, whichever is earlier, to file suit in Federal Court, or you will lose your right to file a lawsuit against the respondent named in your charge.*

If you have any questions, please feel free to contact me at (602) 640-5055.

Sincerely,

MAR 27 2014
Date

Lucy Orta
Enforcement Supervisor

Enclosure

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Morteza Emami<br>C/O Eric E. Vickers, Attorney At Law<br>1100 Wyoming<br>Saint Louis, MO 63118 | From: Phoenix District Office<br>3300 North Central Ave<br>Suite 690<br>Phoenix, AZ 85012 |

☐ On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2014-00133 | Lucy V. Orta,<br>Enforcement Supervisor | (602) 640-5055 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Rayford O. Irvin*

MAR 2 7 2014

Enclosures(s)

Rayford O. Irvin,
District Director

*(Date Mailed)*

cc:  Barry Gomberg – Exec. Director
Human Resources
WEBER STATE UNIVERSITY
1022 University Circle
Ogden, UT 84408